IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

ALBERT BIBBS,

        Petitioner,

  v.

ANTHONY P. KANE, Warden, et al.,

        Respondents.

No. C 05-04024 JSW

**ORDER DENYING PETITION FOR A WRIT OF HABEAS CORPUS**

## INTRODUCTION

Petitioner Albert Bibbs ("Bibbs"), a state prisoner incarcerated at the California Training Facility at Soledad, has filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254. The Petition is now ripe for consideration on the merits, and for the reasons set forth below, the Petition is DENIED.

## BACKGROUND

**A.   Procedural History.**

On July 16, 1991, Bibbs was convicted by a jury of willful, deliberate and premeditated attempted murder and was sentenced to a prison term of seven years to life. (Pet. at 13.) Bibbs does not challenge the validity of his underlying conviction or the sentence imposed by the trial court. Rather, Bibbs's claims are premised on the Board of Prison Term's (the "Board") decision to deny him parole at the parole suitability hearing held on July 27, 2004 (the "July 2004 Hearing").[1] (*Id.* at 12-13, 16.)

---

[1]   California has since replaced the Board of Prison Terms with the Board of Parole Hearings. *See* Cal. Penal Code § 5075(a).

Before the July 2004 Hearing, Bibbs also had appeared before the Board on September 15, 1999, February 27, 2002, and February 25, 2003.  After he was denied parole at the July 2004 Hearing, he filed a petition for a write of habeas corpus before the Superior Court of California, County of Contra Costa (the "Superior Court").  On November 30, 2004, the Superior Court denied Bibbs's habeas petition. (*See* Pet., App. A, Ex. E.)  On January 20, 2005, the California Court of Appeal, First Appellate District (the "Court of Appeal") summarily denied Bibbs's petition. (*See* Pet., App. A, Ex. O.)  On April 13, 2005, the California Supreme Court summarily denied review of Bibbs's habeas petition. (*See* Pet., App. A, Ex. P.)

On October 5, 2005, Bibbs timely filed the instant petition.  Respondents filed an answer on May 4, 2007.  On July 16, 2007, Bibbs filed a traverse.

**B.     Factual Background.**

The facts of the offense are pertinent to the resolution of Bibbs's claims and taken from the decision of the California Court of Appeal, First Appellate District:[2]

> The shooting of Darryl Bedford occurred in the early morning of August 27, 1990, in a residential subdivision in Brentwood.  Bedford was shot twice with a 12 gauge Mossberg 500 shotgun: once in the chest and once in the arm.  Although Bedford survived the attack, he offered little information concerning the attack or his attackers at the preliminary examination, and he did not testify at trial.  Bedford was shot in retaliation for his suspected participation with Tim Wood in the theft of a large amount of methamphetamine (valued at approximately $400,000) belonging to David Terry, a large methamphetamine manufacturer and "dealer" in Contra Costa County.  Terry also had a rock band, which defendant, a drummer, had hopes of joining.  Terry routinely supplied defendant with methamphetamine and in exchange was "willing to do just about anything to help [Terry] out."
>
> That included helping Terry recover the missing methamphetamine.  When defendant and Bedford arrived to stake out the Wood's residence on Bethel Island, Bedford went inside and began to shoot at defendant.  "Wigged out" defendant left and went home. Later that night, Terry contacted defendant again.  According to defendant, he was "tooting" methamphetamine at least 10 times during the 24 hours preceding the shooting.
>
> During the early morning hours of August 27, Terry, Bell and appellant searched for the thieves dressed in camouflaged clothing that defendant had purchased earlier.  Terry, the driver, was armed with a nine millimeter assault rifle, Bell, in the passenger seat, had a M-1 military rifle, and in the back seat with defendant was Terry's Mossberg shotgun.  At some

---

[2]     At the July 27, 2004 Hearing, the Presiding Commissioner stated that he would "accept the findings of the court to be true."  Bibbs did not object. (*See* Pet., App. A, Ex. M (Transcript of July 27, 2004 Hearing) at 10:9-17.)

2

point Terry spotted Bedford and followed him to the Brentwood subdivision. Bedford parked his car and approached Terry. An argument ensued with Terry accusing Bedford of "turning on him and . . . playing with the opposite side . . . ." What happened next is where the factual dispute lies.

The prosecution's evidence suggested that defendant then lifted the shotgun and fired at an unarmed Leford at nearly point blank range, hitting him in the chest. Bedford was pushed back into his car, but he managed to run to a nearby house where he was refused admittance. Bedford then staggered toward an intersection where a commuter was sitting in a parked vehicle. The commuter watched as Bedford, holding his large intestine with both hands, was shot again (in the arm) by a pursing defendant. At Bedford's urging, the commuter placed him in the back of his truck and drove to the nearest hospital. Bell and Terry fled; defendant ran into a freshly tilled field where midway through it he buried the shotgun. Defendant attempted to escape by crawling across the field but was discovered by the police hiding in tall grass in a ditch near the edge of the field.[3]

In his initial statement to the police defendant denied shooting Bedford. He claimed to have hitched a ride from two unknown men who had offered to drive him to Antioch after completing some business. Defendant watched as Bedford pulled out a black .22 caliber Rueger automatic from his rear pocket, and the passenger in the front seat responded by shooting Bedford with a shotgun. Defendant then fled into the field when the passenger came after him with the shotgun.

In his second statement to the police, defendant admitted shooting Bedford but said it was in self-defense. After the argument with Terry, Bedford backed away from the Honda and removed a black Rueger automatic; defendant responded by shooting him with the shotgun.

While in jail, defendant wrote Bedford a letter in which he apologized for the shooting and indicated that Terry had forced him at gunpoint to shoot Bedford. There was no mention of Bedford having been armed.

The defense attempted to establish that defendant had shot Bedford initially in self-defense (Bedford pulled the gun first) and then as a result of duress by Terry, who had threatened to kill defendant if he did not kill Bedford.

Defendant testified that he did not plan to shoot Bedford. He stated that he saw Bedford back away from the car and pull a small black gun (identified by defendant as the one found later by neighborhood teen-agers in a nearby storm drain), from his pocket. Afraid "for [his] life", defendant fired. Terry then ordered defendant to "'get out and finish him or you're dead.'" Knowing that Terry had an assault rifle, defendant did as he was told. Defendant followed Bedford and discharged the shotgun but did not intend to hit Bedford. When he heard Terry drive away, defendant stopped chasing Bedford and ran in the opposite direction.

The gun found by neighborhood teen-agers was an antique, rusted, nickle-plated .38 caliber fully loaded Smith and Wesson revolver. According

---

[3] Terry Bell was arrested a few days later: when stopped Bell had a loaded .380 automatic.

3

> to the teen-agers, they had first observed the gun on February 10, 1991. In March, one of the youths retrieved the gun from the bottom of the storm drain and took it home. A few days later he informed his father about the gun and he summoned the police. But the revolver had not been seen by a defense investigator, a police officer, or a city employee who had searched the storm drains in the end of February.
>
> A number of police officers testified to Bedford's reputation for violence. Bedford also had multiple prior convictions: two counts of assault with a firearm, and single counts of shooting at a vehicle, of being a felon in possession of a concealable firearm, of an unlawful taking of an automobile, and of the unlawful sale of a noncontrolled substance.
>
> Debbie Orum testified that David Terry also had a reputation in the community for being "pretty wild, pretty violent . . . always with . . . a gun [waving] it around. Bragging. Always shooting it off." About two weeks after the shooting, she overheard Terry "bragging" to the effect that he would have shot defendant "then and there" had he not shot Bedford.

(Pet., App. A, Ex. D at 00316-20.)

At the July 2004 Hearing, the Board reviewed Bibbs's prior criminal history. The Board noted that he had no juvenile record and that his first conviction was for carrying a concealed weapon in a vehicle on December 25, 1986. (Pet., App. A, Ex. M at 11:1-3.) Bibbs's next conviction was in April 1987, when he was convicted of occupying property without consent. (*Id.* at 11:20-21.) In January 1989, Bibbs was convicted of obstructing or resisting a public officer. (*Id.* at 12:4-8.)

The Board next reviewed Bibbs's social history. The Board noted Bibbs's father passed away when he was fourteen. (*Id.* at 13:1-2.) Bibbs's mother was a homemaker and also owned and managed apartment buildings. (*Id.* at 13:11-15.) At the time of the hearing, she continued to own and manage apartment buildings. (*Id.*) At about the age of fifteen, Bibbs began using methamphetamine. (*Id.* at 14:13.) He also smoked marijuana and drank alcohol. (*Id.* at 15:4-5.) Bibbs married in 2003. (*Id.* at 13:25.)

Before he was incarcerated, Bibbs worked as a carpenter, a janitor, a tree trimmer, a general maintenance worker, a carpet layer, a handyman, and a house refurbisher. (*Id.* at 14:3-6.) He also has job skills in welding, building maintenance, and carpentry. (*Id.* at 16:23-26.)

The Board reviewed Bibbs's educational programming and vocational advancement while in prison. (*Id.* at 32:22-23.) Bibbs completed sixteen units of vocational mill and cabinet training and also received a certificate of achievement in screen process printing. (*Id.* at 30:16-

4

18-32:2.) Previous to this vocational training, he worked in textiles at the prison for two years. (*Id.* at 31:20-22.) As an inmate, Bibbs also worked in the tool yard, on machine work, in the yard crew, and as a cook. He consistently received a satisfactory work product ratings in all of these fields, except in machine work, where Bibbs also received unsatisfactory and poor ratings. (*Id.* at 32:9-18.) Bibbs had not held a job for a year before his July 2004 Hearing. (*Id.* at 29:3-18.)

The Board noted Bibbs participated in numerous self-help programs and workshops including Family Effectiveness, Purpose Driven Life, Impact of Crime on Victims, Growing up Male, Victims Awareness, Stress Management Training, Anger Management Training, and Substance Abuse Program. (*Id.* at 28:5-33:11, 52:26-27.) Additionally, Bibbs read three self-help books within the month and a half before the July 2004 Hearing. (*Id.* at 29:25-30.) Bibbs participated in Narcotics Anonymous and Alcoholics Anonymous biweekly since 1998. (*Id.* at 33:5-7.) Bibbs also completed fifteen FEMA courses during the course of his imprisonment for the commitment offense. (*Id.* at 27:12-13.)

The Board reviewed Bibbs's prison disciplinary record, finding he received seventeen California Department of Corrections ("CDC")-128(a) ("counseling chronos") violations, including one on March 24, 2003 and another on April 18, 2003. (*Id.* at 27:1-2.) He also received six CDC-115s ("disciplinary infractions") write-ups. His most recent disciplinary infraction occurred on January 21, 2003. (*Id.* at 34:7-8.)

The Board also discussed Bibbs's parole plans: his hope to be paroled in Missouri, where his mother resides and where he also has a job offer. (*Id.* at 15:20-25, 17:4-8.) If Bibbs is paroled in California, he intends to live with his wife in Red Bluff. (*Id.* at 16:2-14.) Bibbs did not believe he would have any difficulty finding a job if released, particularly because of the job skills listed above. (*Id.* at 16:24-26.)

The Board reviewed letters from friends and family in support of Bibbs's release, and a letter from the victim, Darrell Bedford, accepting Bibbs's apology and forgiving Bibbs for his crime. (*Id.* at 18:3-25:1, 49:14-50:6.)

1   A correctional counselor completed Bibbs's Life Prisoner Evaluation Report for the July 2004 Hearing. (*Id.* at 39:8-11.) In the report, the correctional counselor upgraded Bibbs's degree of threat to the community from the previously reported low degree of threat to a moderate degree of threat. (*Id.* at 39:8-11.) The Board also reviewed the Psychological Evaluation for the Board of Prison Terms produced in January 2003. (*See id.* at 44:1-47:23.) The staff psychologist gave Bibbs an excellent prognosis for maintaining his present gains in the community. (*Id.* at 44:1-5.) Further, the psychologist determined Bibbs "does not have a mental health disorder which would necessitate treatment either during his incarceration or following parole" and poses "no greater risk of violence than the average person." (*Id.* at 47:14-23.)

The Board found Bibbs unsuitable for parole and that he posed an unreasonable risk of danger to society or a threat to public safety if released from prison. (*Id.* at 88:17-19.) The Board found the commitment offense to be "really very callous and obviously also calculated." (*Id.* at 88:21-22.) They also found that prisoner Bibbs "failed to upgrade vocationally and has not yet sufficiently participated in beneficial self-help programs." (*Id.* at 89:17-18.) Additionally, the Board addressed the most recent of Bibbs's disciplinary infractions and counseling chronos. (*Id.* at 89:20-90:10.)

The Board recommended that Bibbs gain additional programming, including self-help programming and substance abuse programming. (*Id.* at 92:2-6.) Also, the board would like Bibbs to upgrade vocationally and become disciplinary-free. (*Id.* at 92:6-10.)

## ANALYSIS

**A.  Standard of Review.**

This Court may entertain a petition for a writ of habeas corpus on "behalf of a person in custody pursuant to the judgment of a state court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); *see also Rose v. Hodges*, 423 U.S. 19, 21 (1971). The Ninth Circuit has applied § 2254(d) to review of parole suitability decisions. *See Irons v. Carey*, 505 F.3d 846, 850 (9th Cir. 2007); *Rosas v. Nielsen*, 428 F.3d 1229, 1232 (9th Cir. 2005) (per curiam); *McQuillion v. Duncan*, 306

**United States District Court**
For the Northern District of California

1  F.3d 895, 901 (9th Cir. 2002). Because the petition in this case was filed after the effective date
2  of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), AEDPA's
3  provisions apply. *Jeffries v. Wood*, 103 F.3d 827 (9th Cir. 1996) (en banc).

4  Under AEDPA, this Court may grant the petition with respect to any claim that was
5  adjudicated on the merits in state court only if the state court's adjudication of the claim: "(1)
6  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly
7  established Federal law, as determined by the Supreme Court of the United States; or (2)
8  resulted in a decision that was based on an unreasonable determination of the facts in light of
9  the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *see also Williams*
10 *v. Taylor*, 529 U.S. 362, 413 (2000). Courts are not required to address the merits of a
11 particular claim but may simply deny a habeas application on the ground that relief is precluded
12 by 28 U.S.C. § 2254(d). *Lockyer v. Andrade*, 538 U.S. 63, 70-73 (2003). It is the habeas
13 petitioner's burden to show he is not precluded from obtaining relief by § 2254(d). *Woodford v.*
14 *Visciotti*, 537 U.S. 19, 25 (2002).

15 "Clearly established federal law, as determined by the Supreme Court of the United
16 States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of
17 the time of the relevant state-court decision." *Williams*, 529 U.S. at 412; *Barker v. Fleming*,
18 423 F.3d 1085, 1093 (9th Cir. 2005) ("clearly established" federal law determined as of the time
19 of the state court's last reasoned decision); *Alvarado v. Hill*, 252 F.3d 1066, 1068-69 (9th Cir.
20 2001). "Section 2254(d)(1) restricts the source of clearly established law to [the Supreme]
21 Court's jurisprudence." *Williams*, 529 U.S. at 412. The Supreme Court has explained
22 repeatedly that AEDPA, which embodies deep-seated principles of comity, finality, and
23 federalism, establishes a highly deferential standard for reviewing state-court determinations.
24 *See id.* at 436. Thus, "[a] federal court may not overrule a state court for simply holding a view
25 different from its own, when the precedent from [the Supreme] Court is, at best, ambiguous."
26 *Mitchell v. Esparza*, 540 U.S. 12, 17 (2003) (per curiam).

27 Under the "contrary to" clause of section 2254(d)(1), a federal court may grant the writ
28 only if the state court "applies a rule that contradicts the governing law set forth in [Supreme

7

Court] cases, 'or if it confronts a set of facts that are materially indistinguishable from a decision' of the Supreme Court and nevertheless arrives at a different result." *Early v. Packer*, 537 U.S. 3, 8 (2002) (quoting *Williams*, 529 U.S. at 405-06). Under the "unreasonable application" clause of section 2254(d)(1), a federal court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case. *Williams*, 529 U.S. at 413.

A federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 412. The objectively unreasonable standard is not a clear error standard. *Lockyer*, 538 U.S. at 75-76; *Clark v. Murphy*, 331 F.3d 1062, 1067-69 (9th Cir.), *cert. denied*, 540 U.S. 968 (2003). After *Lockyer*, "[t]he writ may not issue simply because, in our determination, a state court's application of federal law was erroneous, clearly or otherwise. While the 'objectively unreasonable' standard is not self-explanatory, at a minimum it denotes a greater degree of deference to the state courts than [the Ninth Circuit] ha[s] previously afforded them." *Clark*, 331 F.3d at 1068.

In determining whether the state court's decision is contrary to, or an unreasonable application of, clearly established federal law, a federal court looks to the decision of the highest state court to address the merits of a petitioner's claim in a reasoned decision. *LaJoie v. Thompson*, 217 F.3d 663, 669 n.7 (9th Cir. 2000). If the highest state court has summarily denied a petitioner's claim, the habeas court may "look through" that decision to the last state court addressing the claim in a reasoned decision. *Shackleford v. Hubbard*, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000) (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991)).

In this case, the Superior Court denied Bibbs's petition in a reasoned decision. (Pet., App. A, Ex. E.) The Court of Appeal and the Supreme Court then summarily denied review of Bibbs's petition. (Pet., App. A, Ex. O; Pet., App. A, Ex. P.) Accordingly, this Court will "look through" the California Supreme Court's and Court of Appeal's decisions to the Superior

8

Court's decision in deciding whether the state court's decision is contrary to, or an unreasonable application of, clearly established federal law.

**B.      Legal Standards Applicable to Parole Suitability Determinations.**

California's parole scheme is set forth in California Penal Code § 3041, *et seq.* Section 3041(a) provides, in pertinent part:

> In the case of any inmate sentenced pursuant to any provision of law ... [o]ne year prior to the inmate's minimum eligible parole release date a panel of two or more commissioners or deputy commissioners shall again meet with the inmate and shall normally set a parole release date as provided in Section 3041.5. ... The release date shall be set in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public, and that will comply with the sentencing rules that the Judicial Council may issue and any sentencing information relevant to the setting of parole release dates.

Cal. Penal Code § 3041(a).

Penal Code section 3041(b) provides, in pertinent part:

> The panel or board shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting.

Cal. Penal Code § 3041(b).

Title 15 of the California Code of Regulations section 2402 (hereinafter "Section 2402") sets forth the criteria used to determine whether an inmate is suitable for release on parole. The opening paragraph of Section 2402(a) states:

> Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison.

15 Cal. Code Regs. § 2402(a).

Section 2402(b) provides:

> All relevant, reliable information available to the panel shall be considered in determining suitability for parole. Such information shall include the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any considerations of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not

9

firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability.

*Id.* § 2402(b).

Circumstances tending to show unsuitability for parole are:

(1) Commitment Offense. The prisoner committed the offense in an especially heinous, atrocious or cruel manner. The factors to be considered include:

    (A) Multiple victims were attacked, injured or killed in the same or separate incidents.

    (B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.

    (C) The victim was abused, defiled or mutilated during or after the offense.

    (D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.

    (E) The motive for the crime is inexplicable or very trivial in relation to the offense.

(2) Previous Record of Violence. The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age.

(3) Unstable Social History. The prisoner has a history of unstable or tumultuous relationships with others.

(4) Sadistic Sexual Offenses. The prisoner has previously sexually assaulted another in a manner calculated to inflict unusual pain or fear upon the victim.

(5) Psychological Factors. The prisoner has a lengthy history of severe mental problems related to the offense.

(6) Institutional Behavior. The prisoner has engaged in serious misconduct in prison or jail.

*Id.* § 2402(c).

Circumstances supporting a finding of suitability for parole are:

(1) No Juvenile Record. The prisoner does not have a record of assaulting others as a juvenile or committing crimes with a potential of personal harm to victims.

(2) Stable Social History. The prisoner has experienced reasonably stable relationships with others.

(3) Signs of Remorse. The prisoner performed acts which tend to indicate the presence of remorse, such as attempting to repair the damage, seeking

10

> help for or relieving suffering of the victim, or indicating that he understands that nature and magnitude of the offense.
>
> (4) Motivation for Crime. The prisoner committed his crime as a result of significant stress in his life, especially if the stress has built over a long period of time.
>
> (5) Battered Woman Syndrome. At the time of the commission of the crime, the prisoner suffered from Battered Woman Syndrome, as defined in section 2000(b), and it appears the criminal behavior was a result of that victimization.
>
> (6) Lack of Criminal History. The prisoner lacks any significant history of violent crime.
>
> (7) Age. The prisoner's present age reduces the possibility of recidivism.
>
> (8) Understanding and Plans for Future. The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release.
>
> (9) Institutional Behavior. Institutional activities indicate an enhanced ability to function within the law upon release.

*Id.* § 2402(d).

The regulations also contain a matrix of suggested base terms depending on the murder degree and the circumstances surrounding the murder. The matrix provides three choices of suggested base terms for several categories of crimes. *See id.* § 2403. For attempted willful, deliberate and premeditated murders, the matrix of base terms ranges from the low of seven, eight, or nine years, to a high of thirteen,fourteen, or fifteen years, depending on some of the facts of the crime.[4]

Although the matrix is used to establish a base term, an inmate's base term is set only when he or she has been found suitable for parole. *In re Dannenberg*, 34 Cal. 4th 1061, 1087 (2005). Thus, the statutory scheme places individual suitability for parole above a prisoner's

---

[4] One axis of the matrix concerns the relationship between an attempted murderer and victim and the other axis of the matrix concerns the resulting injury from the crime. The choices on the axis for the relationship of an attempted murderer and victim are "participating victim," "prior relationship," "no prior relationship," and "threat to public order or murder for hire." The choices on the axis for the resulting injury of the action are "minor injury," "victim assaulted," "major injury," and "torture." Each of the choices are further defined in the matrix. *See* 15 Cal. Code Regs. § 2403(d).

11

expectancy in an early setting of a fixed date designed to ensure term uniformity. *Id.* at 1070-71.

> While subdivision (a) of section 3041 states that indeterminate life (i.e., life-maximum) sentences should "normally" receive "uniform" parole dates for similar crimes, subdivision (b) provides that this policy applies "*unless* [the Board] determines" that a release date cannot presently be set because the particular offender's crime and/or criminal history raises "*public safety*" concerns requiring further indefinite incarceration. (Italics added.) Nothing in the statute states or suggests that the Board must evaluate the case under standards of term uniformity before exercising its authority to deny a parole date on the grounds the particular offender's criminality presents a *continuing public danger*.

*Id.* at 1070 (emphasis, brackets, and parentheses as in original). In sum, "the Board, exercising its traditional broad discretion, may protect public safety in each discrete case by considering the dangerous implications of a life-maximum prisoner's crime individually." *Id.* at 1071. The California Supreme Court's determination of state law is binding in this federal habeas action. *See Hicks v. Feiock*, 485 U.S. 624, 629 (1988); *Sandstrom v. Montana*, 442 U.S. 510, 516-17 (1979).

The California Supreme Court also has determined that the facts of the crime alone can support a sentence longer than the statutory minimum, even if everything else about the prisoner is laudable. "While the board must point to factors beyond the minimum elements of the crime for which the inmate was committed, it need engage in no further comparative analysis before concluding that the particular facts of the offense make it unsafe, at that time, to fix a date for the prisoner's release." *Dannenberg*, 34 Cal. 4th at 1071; *see also In re Rosenkrantz*, 29 Cal. 4th 616, 682-83 (2002) ("[t]he nature of the prisoner's offense, alone, can constitute a sufficient basis for denying parole" but might violate due process "where no circumstances of the offense reasonably could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that offense").

**C.     The Board's Decision to Deny Bibbs Parole Did Not Violate Due Process.**

   **1.     Legal Standards.**

Bibbs asserts that the Board's decision to deny him parole at the July 2004 Hearing violated his Due Process rights. "In analyzing the procedural safeguards owed to an inmate under the Due Process clause, [a court] must look to two distinct elements: (1) a deprivation of a constitutionally protected liberty or property interest, and (2) a denial of adequate procedural

12

safeguards." *Biggs v. Terhune*, 334 F.3d 910, 913 (9th Cir. 2003).[5] The second prong of this test is satisfied if: (1) the inmate has been afforded an opportunity to be heard and, if denied parole, informed of the reasons underlying the decision; and (2) the Board's decision is supported "some evidence" or is not otherwise arbitrary. *Hayward v. Marshall*, 512 F.3d 536, 542 (9th Cir. 2008) (citing *Irons,* 505 F.3d at 851 and *Sass v. Cal. Bd. of Prison Terms*, 461 F.3d 1123, 1128-29 (9th Cir. 2006)); *Jancsek v. Oregon Bd. of Parole*, 833 F.2d 1389, 1390 (9th Cir. 1987).

Bibbs does not argue that he was denied an opportunity to be heard or that the Board failed to inform him of its reasons for the decision. Rather, he contends the Board's conclusion that he would pose an unreasonable risk of danger to society if released is both arbitrary and not supported by "some evidence." Respondent argues that the "some evidence" standard is not clearly established federal law. That argument is foreclosed by Ninth Circuit authority. *See Sass*, 461 F.3d at 1129. Respondent further argues, that even if the "some evidence" standard applies, the Board's decision that Bibbs posed an unreasonable danger to society was supported by "some evidence."

"To determine whether the some evidence standard is met 'does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion' reached by the parole board." *Sass*, 461 F.3d at 1128 (quoting *Superintendent v. Hill*, 472 U.S., 445, 455-56 (1985)). "*Hill*'s "some evidence" standard is minimal and assures that 'the record is not so devoid of evidence that the findings of the disciplinary board were without support or otherwise arbitrary.'" *Id.* at 1129 (quoting *Hill*, 472 U.S. at 457). Further, in order to determine whether the Board's decision to find

---

[5] Respondent denies that Bibbs has a federally protected liberty interest in parole. (Answer at ¶ 11.) However, this argument is foreclosed by controlling Ninth Circuit authority. *See, e.g., Irons*, 505 F.3d at 850 ("California Penal Code section 3041 vests ... all ... California inmates whose sentences provide for the possibility of parole with a constitutionally protected liberty interest in the receipt of a parole release date, a liberty interest that is protected by the procedural safeguards of the Due Process Clause."); *Sass v. Cal. Bd. of Prison Terms*, 461 F.3d 1123, 1125 (9th Cir. 2006) ("We hold that California inmates continue to have a liberty interest in parole after *In re Dannenberg*, 34 Cal. 4th 1061 (2005).").

13

1  Bibbs unsuitable for parole is supported by "some evidence," this Court must focus not on
2  whether "some evidence" "that a particular factor or factors indicating unsuitability exist," but
3  on whether there is "some evidence" to conclude that "a prisoner's release will unreasonably
4  danger public safety." *Hayward*, 512 F.3d at 543 (citations omitted).

### 2. Analysis.

At the July 2004 Hearing the Board, and in turn the Superior Court, found Bibbs unsuitable for parole and an unreasonable risk or danger to others if released based on the following findings: (1) the commitment offense was carried out in an especially calculated and callous manner; (2) his previous criminal record demonstrated that Bibbs had an escalating pattern of criminal conduct; (3) Bibbs is not free of institutional disciplinary infractions; and (4) Bibbs had not yet sufficiently participated in beneficial self-help programming and vocational training.

### a. The Nature of the Offense.

The first section 2402 factor on which the Board relied to find Bibbs unsuitable for parole is that he committed the offense in an "especially callous manner." 15 Cal. Code Regs. § 2402(c)(1)(B). "A prisoner's commitment offense may constitute a circumstance tending to show that a prisoner is presently too dangerous to be found suitable for parole, but the denial of parole may be predicated on a prisoner's commitment offense only where the Board can 'point to factors beyond the minium elements of the crime for which the inmate was committed' that demonstrate the inmate will, *at the time of the suitability hearing*, present a danger to society if released." *Irons*, 505 F.3d at 852 (quoting *Dannenberg*, 34 Cal. 4th at 1071) (emphasis added).

In *Goldsby v. Kane,* 2008 WL 619022 (N.D. Cal. Mar. 4, 2008), the court found that the circumstances of a murder and an attempted murderer constituted "some evidence." The petitioner shot one victim multiple times at close range and shot the other victim as he was running away and thus posed no threat. *Id.* at *4. The Court further noted the petitioner drove around looking for the victim who ran away, presumably to kill him. *Id.* Moreover, the petitioner shot at the fleeing victim in a public place, thus demonstrating a callous disregard for

14

1  human suffering in that the petitioner created a potential for serious injury or death to persons
2  other than the intended victims. *Id.* The Court found that such circumstances provided "some
3  evidence" that the petitioner was not suitable for parole.

4  Similar to *Goldsby*, Bibbs dressed in camouflage and spent the morning looking for
5  the victim. (Pet., App. A, Ex. E at 00368; *Id.*, Ex. D at 000316-17.) When he found the
6  victim, Bibbs shot him twice at point blank range, severely injuring him. (Pet., App. A, Ex. E
7  at 00368.) As the victim was running away and holding his intestines with both hands, Bibbs
8  pursued him and shot him again. (Pet., App. A, Ex. D at 000317.) This occurred in a
9  residential neighborhood. (*Id.* at 000316-17.) In fact, a commuter, who was sitting in a parked
10 vehicle observed Bibbs shoot the fleeing victim. (*Id.* at 000317.) Such facts provide evidence
11 for the Board's decision to deny parole based on the nature of the offense. It is not this Court's
12 province to independently assess the credibility of witnesses or weigh the evidence. *Hill*, 472
13 U.S. at 455; *Sass*, 461 F.3d at 1128. As such, the Court concludes that the Superior Court's
14 decision to affirm the parole denial based on the facts of the offense is supported by "some
15 evidence."

### b.     Bibbs's Disciplinary Infractions.

17 Another factor in the analysis of parole suitability is the petitioner's institutional
18 behavior. If the state court finds "the prisoner has engaged in serious misconduct in prison," it
19 tends to show unsuitability for parole. 15 Cal. Code. Regs. § 2402(c)(6). The Board noted that
20 Bibbs had a total of seventeen counseling chronos while incarcerated, receiving two since the
21 previous parole hearing in February 2003. (Pet., App. A, Ex. M at 34:10.) More importantly,
22 Bibbs accumulated a total of six disciplinary infractions. (*See id.* at 34:7.) The most recent of
23 these disciplinary infractions occurred in January 2003 for obstructing a peace officer. (Pet.,
24 App. A, Ex. E at 00367.) Bibbs's previous disciplinary infractions included one for aggressive
25 behavior. (*Id.*) At the parole hearing, Bibbs acknowledged the relation of his disciplinary
26 infractions to his attitude by stating that he had a "real attitude problem" and seemed to "buck
27 authority." (*See id.* at 00368.)

28

15

1   Bibbs argues that his counseling chronos and disciplinary infractions were not
2   "disciplinary." In support of this assertion, he relies *In re Mark Smith*, 109 Cal. App. 4th 489
3   (2003). Bibbs's reliance on *In re Mark Smith* is misplaced. The court in *In re Mark Smith*
4   merely held that receiving counseling chronos does not support denying parole because
5   counseling chronos document "minor misconduct, not discipline." *Id.* at 504. Here, Bibbs
6   received CDC-115 disciplinary infractions in addition to counseling chronos. Other courts
7   have held that reliance on such prison disciplinary infractions constituted some evidence
8   supporting parole denials. *Robles v. Solis*, 2006 WL 2934086, *4 (N.D. Cal. Oct. 12, 2006);
9   *Lomas v. Curry*, 2008 WL 787176, *7-8 (N.D. Cal. Mar. 20, 2008). Therefore, the Court finds
10  the Superior Court reasonably relied on Bibbs's institutional disciplinary record to support its
11  determination that Bibbs poses an unreasonable risk of danger to society.

When the Court looks to the record as a whole, the Court finds that the Superior Court's determination that there was "some evidence" to support the Board's decision to find Bibbs unsuitable for parole was not contrary to and did not involve an unreasonable application of clearly established federal law. Accordingly, Bibbs's petition is DENIED on this basis.[6]

### c. The Concerns Articulated in *Biggs v. Terhune* Are Not Implicated In this Case.

In *Biggs*, the Ninth Circuit stated that,

> [o]ver time, ... , should Biggs continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of his offense would raise serious questions involving his liberty interest. ...
>
> A continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation.

*Biggs*, 334 F.3d at 916-17; *cf. Dannenberg*, 34 Cal. 4th at 1094 ("sole reliance on the commitment offense might, in particular cases, violate" section 3041(a)'s "provision that a

---

[6] Because the Court finds the commitment offense and institutional disciplinary violations meet the "some evidence" standard to find Bibbs unsuitable for parole, the Court need not address the remaining factors considered by the Board and Superior Court.

16

1  parole date 'shall normally be set' under 'uniform term principles, and might thus also
2  contravene the inmate's constitutionally protected expectation of parole"); *Rosenkrantz*, 29
3  Cal. 4th at 682-83 ("[t]he nature of the prisoner's offense, alone, can constitute a sufficient
4  basis for denying parole" but might violate due process "where no circumstances of the offense
5  reasonably could be considered more aggravated or violent than the minimum necessary to
6  sustain a conviction for that offense").

7  In issuing the note of caution in *Biggs* regarding continued reliance on unchanging
8  factors, the Ninth Circuit gave little guidance to district courts as to how they should evaluate
9  such a claim. In *Irons,* however, the court noted that when it had determined that "a parole
10 board's decision to deem a prisoner unsuitable for parole solely on the basis of his commitment
11 offense comport[ed] with due process, the decision was made before the inmate had served the
12 minimum number of years required by his sentence." *Irons*, 505 F.3d at 853. The court
13 concluded that "[a]ll we held in [*Biggs* and *Sass,*] and all we hold today, therefore, is that,
14 given the particular circumstances of the offenses in these cases, due process was not violated
15 when these prisoners were deemed unsuitable for parole prior to the expiration of their
16 minimum terms." *Id.* at 853-54. The *Irons* court further "expressed its hope that the Board
17 will come to recognize that in some cases, indefinite detention based solely on an inmate's
18 commitment offense, regardless of the extent of his rehabilitation, will at some point violate
19 due process, given the liberty interest in parole that flows from the relevant California
20 statutes." *Id.* at 854.

21 The lessons this Court draws from *Biggs*, *Sass*, *Irons, Dannenberg, Rosencrantz*, and
22 various district court opinions that have applied the principles articulated therein,[7] are as

---

[7] *See, e.g.*, *McCullough v. Kane*, 2007 WL 1593227 at *6, *9 (N.D. Cal. June 1, 2007) (finding due process violation in Governor's reversal of the Board's decision to grant parole after petitioner had served twenty-one years of fifteen years to life sentence for second degree murder and met circumstances tending to indicate suitability for parole); *Brown v. Kane*, 2007 WL 1288448 at *1 (N.D. Cal. May 2, 2007) (finding due process violation in Governor's reversal of the Board's decision to grant parole at tenth parole suitability hearing after petitioner had served twenty-four years of fifteen years to life sentence for second degree murder and met circumstances tending to indicate suitability for parole); *Pirtle v. Cal. Bd. of Prison*, 2007 WL 1140817 at *3 (E.D. Cal. Apr. 17, 2007) (finding due process violation in Board's denial of parole based on petitioner's commitment offense, criminal

17

1  follows: (1) that the Board may properly consider the nature of the commitment offense to
2  determine whether or not a prisoner is suitable for parole; (2) that in certain instances the
3  nature of the offense alone may support a finding that the prisoner is unsuitable for parole; and
4  (3) at some unspecified point, the nature of the offense will no longer be of sufficient
5  predictive value in determining whether or not a prisoner poses too great a risk of danger to be
6  considered suitable for parole.

In his Petition, Bibbs challenges the Board's actions at his fourth suitability hearing, which occurred fourteen years into a seven years to life sentence. At the fourth suitability hearing, the Board did not solely rely on "unchanging factors." In addition to citing the "unchanging factors" of Bibbs's commitment offense, the Board also relied on Bibbs's disciplinary infractions while in prison. (Pet., App. A, Ex. M at 34:7-10, 89:17-90:10.) Similarly, in *Montue* the court found the Board relied on

> more than the 'unchanging factor' of petitioner's commitment offense and criminal history in denying him parole. Although the callous nature of petitioner's commitment offense and criminal history weighed heavily in the Board's determination, his unstable social history, his prison disciplinary history, and his limited programming in prison, also counseled against parole.

*Montue v. Schwartz*, 2008 WL 906440, *6 (E.D. Cal. Apr. 1, 2008); *see also Webb v. Kane*, 2008 WL 787182, *8 (N.D. Cal. Mar. 20, 2008) (finding the petitioner's disciplinary infractions in prison reflected an unwillingness to follow rules and conform to societal norms and thus supported the decision to deny parole). Because the Board, and in turn the Superior Court, did not rely solely on "unchanging" factors to deny parole, the concerns implicated in *Biggs* are not implicated in this case. Accordingly, the Court finds that this claim is without merit and DENIES the Petition on this basis as well.[8]

---

record, unstable social history, failure to upgrade vocationally, and need for further therapy to cope with stress), *report and recommendation adopted* 2007 WL 15446620 (E.D. Cal. May 29, 2007); *Thomas v. Brown*, 513 F. Supp. 1124 (N.D. Cal. 2006) (finding due process violation in Governor's reversal based on petitioner's commitment offense, his failure to accept responsibility, his need for further therapy, and his criminal history).

[8] Bibbs also alleges that his incarceration has become disproportionate to offenses committed under similar circumstances. (Pet. at 62-66.) However, the Board has not yet found Bibbs suitable for parole. Pursuant to the California Supreme Court's decision in *Dannenberg*, a determination of suitability precedes a determination of the appropriate

18

**D.  Bibbs's Claim That the Board Operates Under a No-Parole Policy is Moot.**

Bibbs contends that, under former Governor Gray Davis's administration, the Board implemented a policy in which it denied parole to prisoners who had been sentenced to indeterminate terms. Even if, as Bibbs asserts, a policy existed under the former Governor's administration, the proper relief would be to grant him a new hearing before a Board unaffected by the policy. *See, e.g., Rush v. Kane*, 2007 U.S. Dist. LEXIS 89259 at *25 n.5 (N.D. Cal. 2007); *Coleman v. Board of Prison Terms,* 2004 U.S. Dist. LEXIS 29929 at *12-13 (E.D. Cal. 2004), *aff'd*, 228 Fed. Appx. 673 (9th Cir. 2007). Bibbs has received at least two additional hearings under Governor Arnold Schwarzenegger's administration. Thus, because there is no evidence that suggests the alleged "no parole" policy carried over into Governor Schwarzenegger's administration, Bibbs already has been provided additional fair hearings. Accordingly, this claim is DENIED AS MOOT. *Rush,* 2007 U.S. Dist. LEXIS 89259 at *25.

## CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED. A separate judgment shall issue, and the Clerk shall close the file.

**IT IS SO ORDERED.**

Dated: May 7, 2008

JEFFREY S. WHITE
UNITED STATES DISTRICT JUDGE

---

matrix term. Accordingly, the Court finds this claim without merit and DENIES the Petition on that basis as well.